* * * * * * * * * * *
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Ledford. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. The employee-employer relationship existed between plaintiff and defendant at all times relevant to this claim.
3. The workers' compensation carrier on the risk is CompCarolina.
4.Plaintiff's average weekly wage may be determined from a Form 22, which was to be submitted by defendants post-hearing. Defendants faxed a Form 22 to the deputy commissioner and to plaintiff's counsel. Although the cover letter was dated June 10, 2005, neither the Commission nor plaintiff's counsel have a record of receiving this Form 22 prior to the date of the filing of the deputy commissioner's Opinion and Award.
5. The parties submitted the following documents: plaintiff's medical records, Dr. Kellam's questionnaire dated December 22, 2004, and I.C. forms.
6. Plaintiff submitted the following exhibits: Internet page from www.easyeddiesmc.com, Full Throttle Magazine Issue 82 dated March 1, 2005, and Accident Report dated November 1, 2005.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the date of the hearing before the deputy commissioner, plaintiff was 43 years of age. He quit high school in the eleventh grade. His work history has all involved physical labor. He did some welding and has worked in the motorcycle business.
2. Plaintiff began working for defendant in July 2003 as a parts manager and was employed by defendant as a parts manager on November 1, 2003. Defendant was in the business of selling and servicing motorcycles and was owned by Edgar "Eddie" Dean Ellis. Plaintiff's job duties and required skills included providing customer service, having knowledge about motorcycles and parts, helping with company events and helping to promote defendant's business.
3. Plaintiff testified that he was paid $10 per hour and often worked more than forty hours per week, but was only paid wages for a 40-hour week, which would equal average weekly wages of $400. The Form 22 submitted by defendants shows that plaintiff worked consistently, every day, but would indicate wages averaging only $313.53 per week. The Form 22 was not submitted in a timely manner and in reviewing the Form 22, in which numbers have been marked through, and weighing it against plaintiff's testimony, the Full Commission gives more weight to plaintiff's testimony.
4. "Poker runs" are events in which participating bikers would go from stop to stop, such as motorcycle dealers and pubs or adult establishments, and play a poker hand, picking a different card at each stop. These poker runs are generally sponsored by motorcycle dealerships and other businesses, such as the pubs. The sponsors would pay the expenses of the run, and would often provide food and beverages at stops during the run. The sponsors would also provide t-shirts with the name of their establishment for employees to wear while participating.
5. The participants would purchase a hand at the beginning of the run and would complete a registration form for the hand of cards. At the end of the run, the winning hand would receive a share of the proceeds. If the event was for a charity, the charity also received a portion of the proceeds. Otherwise, the sponsor, such as Easy Eddie's, would split the proceeds with the holder of the winning poker hand.
6. Defendant was well known as a sponsor of poker runs. These runs were advertised on defendant's web site and in biker publications such as Full Throttle, a free magazine, which was provided at dealerships, including Easy Eddie's. Motorcycle friendly establishments, including the sponsors, would often distribute flyers for the runs. These establishments would often have in-store listings of all upcoming events, including runs. The sponsor would handle the sign-ups and registration cards.
7. Plaintiff had helped defendant with fundraising and other events prior to plaintiff's employment with defendant. Plaintiff was not compensated for this work, but had offered his help solely to assist defendant and its owner Eddie Ellis, someone plaintiff had considered a close friend.
8. Defendant encouraged and expected its employees to participate in poker runs sponsored by defendant. Defendant provided business cards for the participating employees to hand out. Defendant was particularly interested in employees who had contact with the public, such as the parts manager, participating in the poker runs and promoting defendant's business.
9. Non-employee participants on poker runs would often ask employees questions about motorcycles during the runs. Employees would answer questions, as part of their responsibility to promote the business of their employer. Employees would hand out business cards, mingle with the other participants and patrons at the various stops, and would wear company t-shirts. A poker run was a good opportunity for a dealership to get publicity and to display motorcycles, such as the custom bikes built at defendant's business.
10. The greater weight of the evidence shows that poker runs benefit the sponsor because the sponsor appears charitable and the runs ensure a steady flow of traffic at the sponsor's place of business, thus increasing store sales. The runs help spread the sponsor's name in the biker community and the runs increase goodwill between the sponsor and the biker community.
11. Defendant was the only named sponsor of Easy Eddie's Annual Adult Poker Run. This Adult Run was not for charity and the proceeds were split between the people with the winning hands and defendant. Eddie Ellis' wife, Judy Fitch, started the Adult Run, which was held twice a year every year. The Run was set for November 1, 2003. Defendant advertised for the Adult Run in Full Throttle Magazine, in the store, and on its web site, www.easyeddiesmc.com.
12. Defendant also advertised for its upcoming runs by email from the defendant's email address, easyeddiesmc@cs.com. Plaintiff received these emails, including one on March 1, 2005, which advertised the 2005 Adult Run. Plaintiff had been on several poker runs in the past as an employee of defendant, and had a customary practice of attending poker runs as an employee.
13. Although he is a recovering alcoholic and does not drink, or otherwise frequent bars, plaintiff participated in these runs because he felt it was expected by defendant, who encouraged employees to go on its poker runs. Defendant was demanding of its employees and tried to persuade those employees who dealt with the general public on a daily basis, such as plaintiff, to participate in these runs. Defendant was not pleased if an employee declined to participate.
14. Plaintiff personally observed Eddie Ellis in an argument with another employee, Kevin Kok, regarding Mr. Kok's participation at a company event. Plaintiff heard Eddie Ellis tell Mr. Kok that his participation in these events was a necessary part of doing business and that Eddie Ellis needed Mr. Kok to "rub elbows with the customers."
15. The Adult Run started at defendant's place of business and all participants registered there. The employees bought poker hands and registered these hands on a sheet of paper at the beginning of the Adult Run. Therefore, Eddie Ellis knew which employees attended the Adult Run as a result of collecting the registration forms and having only seven employees.
16. On Saturday, November 1, 2003, plaintiff had worked during the day. Right before the Adult Run, a customer was coming in to the store to get a new rim. The registration took place between 4 and 6 pm at defendant's place of business, which was the starting point of the poker run. During these hours defendant's store was open. When the Adult Run began, the store would close its doors to the public. Plaintiff helped with registration and registered himself for a hand. He took defendant's business cards to hand out at the stops.
17. Prior to the Adult Run, defendant requested that plaintiff participate in the Run. Defendant arranged for plaintiff to ride a custom built bike, built by defendant, in the Run to show it off and generate publicity. Robert Legg, a former employee, had done most of the work building the bike, installing the motor, transmission, drive line, front wheels and tires.
18. When the Run began, defendant also asked plaintiff to take a female passenger, a friend of theirs, on the Run. Although plaintiff did not want a passenger, he took the rider at defendant's request. Plaintiff was wearing an Easy Eddie's t-shirt.
19. Plaintiff perceived that this Adult Run was mandatory for him to attend based upon his perceived role with defendant, his dealings with the owner, Eddie Ellis, and what he knew and had observed about Eddie Ellis. Plaintiff had the perception that he would be penalized or would be on Eddie Ellis' bad side if he did not attend the Adult Run.
20. It is doubtful that plaintiff would have attended the Adult Run for any personal reasons. Plaintiff attended the run at the request of defendant. Based upon his conversations with Eddie Ellis, plaintiff felt it was mandatory for him to attend. On prior runs, if the runs included stops at bars, plaintiff attended each stop for a few minutes unless defendant was a sponsor. If defendant was a sponsor, then plaintiff stayed for 30-60 minutes at each stop to promote defendant's business by handing out business cards, answering questions, and talking about the store.
21. Defendant specifically wanted plaintiff, Kevin Kok, the shop manager, Judy Ellis, an employee, and himself on the runs since these were the employees who dealt with the public more often. Defendant did not view other employees that did not normally deal with the general public, such as mechanics, as essential to participate in the poker runs.
22. At each stop on the Adult Run, plaintiff handed out business cards, talked to patrons, shook hands with them and answered questions about bikes and parts. The greater weight of the evidence shows that an appreciable benefit to defendant was rendered when employees such as plaintiff participated in defendant's sponsored poker runs. The Adult Run benefited defendant in numerous ways. It generated publicity and good will between the store and the biker community. It drew potential customers to the store and increased sales.
23. After the third stop on the Adult Run on November 1, 2003, plaintiff was in an intersection, helping to block traffic so that all of the bikers could pass through the intersection and stay together. The act of blocking oncoming traffic is a customary practice on such bike rides and is necessary for the bikers' safety.
24. While plaintiff was blocking traffic, the driver of a Ford Explorer smoked its tires, and then blew through the red light and hit plaintiff on his right side. Plaintiff was propelled onto the car's windshield and then onto the ground. Plaintiff looked up at the driver of the Explorer who then sped away from the scene, leaving plaintiff on the street.
25. At the time of the accident, plaintiff had been riding a custom-built bike that was built at defendant's place of business, kept at defendant's place of business, and carried defendant's dealer tag. As acknowledged by Robert Legg, who had built the bike, and by Eddie Ellis, the bike had been built for Eddie Ellis' son, Derek. Both Derek and plaintiff had previously ridden the bike. Eddie Ellis testified that after the accident, Derek was angry that he let plaintiff ride the bike in the Run, and that the bike had been damaged.
26. Eddie Ellis spoke with the investigating officer and gave them defendant's address and name as the owner of the custom-built bike that plaintiff had been riding at the time of the accident. The plate of the bike plaintiff was riding was MD-1749 and had been since the date it was built. This tag is a motorcycle dealership plate. The bike had no insurance nor had it ever been titled.
27. Eddie Ellis had required plaintiff to enter this custom-built bike into shows as recently as October of 2003. Eddie Ellis never paid plaintiff for his time at the bike shows but plaintiff went to the shows to help promote defendant's business. Defendant sold custom-built bikes such as the one plaintiff was riding at the time of his accident. Defendant had also listed this specific bike for sale on its website and the bike had been on the show floor for sale.
28. Participation in these shows as well as having plaintiff ride this bike during the Adult Run benefited defendant in that it was a highly visible rolling advertisement of the custom work defendant did and it was free publicity for defendant.
29. As a result of the accident, plaintiff sustained serious injuries, particularly to his right leg. Plaintiff underwent reconstructive surgery in attempt to put his leg back together. A day or two after the accident, the treating surgeon, Dr. Kellam of Myers Park Orthopedics, took muscle out of plaintiff's back and rebuilt plaintiff's leg. Plaintiff remained hospitalized for approximately three weeks after the accident.
30. Plaintiff's right leg became infected and five weeks after the accident, his leg was amputated. Plaintiff subsequently had several infections and bone spurs, and, thus, has had approximately eleven surgeries including stump revisions.
31. As a consequence of his serious injuries, and the amputation of his leg and numerous surgeries, plaintiff became depressed. Plaintiff has been treated for depression and psychiatric disorders as a result of the accident. On November 6, 2004, plaintiff attempted suicide. Around the time of the attempted suicide, plaintiff was hospitalized for post-traumatic stress disorder and depression for approximately three weeks.
32. Plaintiff performed one to two week's worth of work for defendant in Myrtle Beach, South Carolina, selling tires at "Bike Week" in the Spring of 2004. Defendant paid plaintiff $200.00 total for his time. Plaintiff otherwise has not worked since the accident.
33. Plaintiff continues to be under Dr. Kellam's care and had stump revision surgery on April 10, 2005. Dr. Kellam has not released plaintiff to return to any work. Plaintiff has limited education and work experience. He has not undergone any vocational rehabilitation.
34. Since the accident, both defendant's owner Eddie Ellis and friends of his in the biker community, have attempted to intimidate plaintiff not to pursue this claim. On February 18, 2005, John Baucomb, a friend of Eddie Ellis, approached plaintiff at defendant's request at an Alcoholics Anonymous meeting and told plaintiff that he needed to drop the Workers' Compensation suit because "a brother does not do this to another brother." Mr. Baucomb told plaintiff that plaintiff should not be represented by an attorney.
35. Mr. Baucomb arranged a meeting on February 21, 2005 between himself, Eddie Ellis, and plaintiff, which was held at defendant's place of business. Eddie Ellis handed plaintiff a piece of paper with the Industrial Commission's phone number on it and instructed plaintiff to call the number and drop the suit. Mr. Baucomb produced his individual cell phone and dialed the number for plaintiff. Plaintiff was told by the Industrial Commission that only his attorney of record could drop the suit.
36. Mr. Baucomb, on a few occasions called plaintiff to find out if he had called his attorney to drop the suit. When plaintiff responded that he had not done so, some bikers went to plaintiff's residence and took his Riders in Recovery patches.
37. Defendant was not willing to accommodate plaintiff's injuries nor offer plaintiff suitable employment after plaintiff filed this Workers' Compensation claim, on April 13, 2004.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. The greater weight of the evidence supports the conclusion that on November 1, 2003, plaintiff sustained an injury by accident to his right leg arising out of and in the course of his employment with defendant. N.C. Gen. Stat. § 97-2(6), Martin v. Mars Manufacturing Company, Inc.and CNA Insurance Company. 58 N.C. App. 577, 293 S.E.2d 816 (1982).Keziah v. Monarch Hosiery Mills and Standard Fire InsuranceCompany, 71 N.C. App. 793, 323 S.E.2d 356 (1984).
2. As a result of his injury by accident, plaintiff sustained serious injury to his right leg, which has resulted in the amputation of his right leg. Defendants are responsible for payment of all medical expenses incurred as a consequence of the injury by accident. N.C. Gen. Stat. §§ 97-2(19), 97-25.
3. As a result of his injury by accident, plaintiff became depressed and needed psychiatric treatment. Defendants are responsible for payment of all medical expenses incurred or to be incurred for plaintiff's psychiatric treatment for his depression. N.C. Gen. Stat. §§ 97-2(19),97-25.
4. Based upon plaintiff's testimony, he had an average weekly wage of $400, yielding a compensation rate of $266.80. N.C. Gen. Stat. §97-2(5).
5. Due to this serious injury, and the ongoing medical treatment he has undergone, as well as his limited education and work experience, plaintiff has been unable to earn wages in any employment and has been totally disabled since the date of the accident. He is entitled to compensation for his total disability at the rate of $266.80 per week, beginning November 1, 2003 and continuing until further Order of the Commission. N.C. Gen. Stat. § 97-29.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff for treatment of the injuries sustained in the vehicular accident of November 1, 2003.
2. Defendants shall pay compensation to plaintiff for temporary total disability at the rate of $266.80 per week beginning November 1, 2003 to present and continuing until further Order of the Commission. The amount of said compensation which has already accrued, shall be paid in a lump sum, subject to the attorney's fee.
3. For all future payments to which plaintiff may become entitled, an attorney's fee in the amount of twenty-five percent (25%) of all compensation due plaintiff is hereby approved for plaintiff's counsel, and every fourth check shall be made payable to plaintiff's counsel and forwarded directly to plaintiff's counsel.
4. Defendants shall pay all costs.
This the 20th day of November, 2006.
 S/___________________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ PAMELA T. YOUNG COMMISSIONER